CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 SEP 11  AM 9: 01

DEPUTY CLERK_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **317 - CV 2405 - G** |
| v. | § | Case No.: |
| | § | |
| CHRISTOPHER A. FAULKNER, | § | |
| HOMES INC., | § | |
| HOMESINC RENAISSANCE, LLC, | § | **Jury Trial Demanded** |
| MATTHEW RAPOPORT, and | § | |
| EARL NELSON DAVENPORT, | § | **FILED UNDER SEAL** |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") files this Complaint against Defendants Christopher A. Faulkner, Homes Inc., HOMESINC Renaissance, LLC, Matthew Rapoport, and Earl Nelson Davenport (collectively "Defendants"), and alleges as follows:

## SUMMARY

1.    Since the fall of 2016, Defendants Christopher A. Faulkner ("Faulkner"), Matthew Rapoport ("Rapoport") and others under their direction have duped investors into purportedly funding real estate projects. Among other misrepresentations, they claim that Defendant Homes, Inc. ("Homes"): (a) has a proven and extensive track record of offering and selling passive real estate investments to investors; (b) used investor funds for the acquisition, renovation, and re-sale of residential real estate ("flips") in Southern California; and (c) consistently produced double-digit returns to its investors. To perpetuate this fiction, Faulkner and Rapoport touted these misrepresentations in marketing materials about Homes' supposed

1

latest unregistered securities offering, Defendant HOMESINC Renaissance, LLC

("Renaissance"). In reality, Homes has *never* engaged in any investor-funded real estate

transaction and is not using Renaissance investor funds for real estate-related expenses. The

SEC files this action to halt this ongoing securities fraud.

2.      In November 2016, Faulkner contacted a Dallas, Texas-based printer and told him

that he was "starting a new venture out in Los Angeles" and that he needed marketing materials

printed for the "same scenario as what we used to do at Breitling." Faulkner was referring to his

prior venture at Breitling Oil and Gas Corporation ("BOG")—the subject of an SEC lawsuit filed

in 2016—whereby BOG and other companies that Faulkner controlled offered and sold oil-and-

gas interests to investors across the country using a series of marketing materials.[1]

3.      Faulkner thereafter concocted a new offering fraud by repackaging the critical

elements of his Breitling Scheme. This time, Faulkner pivoted to a new industry: real estate. As

detailed below, Faulkner and Rapoport created, edited, and approved various deceptive and

misleading marketing materials touting Homes' purported expertise and past projects; many of

these false claims likewise are found on Homes' publicly available website created by Faulkner

and Rapoport. Faulkner and Rapoport purposely omitted any mention of Faulkner's control

over, or association with, Homes or Renaissance in the marketing materials or on the website.

4.      Faulkner and Rapoport also set up a call center at Homes' headquarters and hired

a sales staff to solicit investments from prospective investors across the country by telephone.

To lead the sales staff, Faulkner and Rapoport hired Defendant Earl Nelson Davenport

("Davenport"), a salesman previously sanctioned by two states for unrelated securities law

---

[1]      In June 2016, the SEC filed a complaint against Faulkner, BOG, Breitling Energy Corporation ("BECC"), and others alleging that Faulkner orchestrated a massive, multipronged scheme in connection with the offer and sale of these oil-and-gas interests that defrauded investors across the country out of approximately $80 million (the "Breitling Scheme"). *See SEC v. Christopher A. Faulkner, et al.*, No. 3:16-cv-01735-D (N.D. Tex.) (Fitzwater, J.).

violations, as Homes' sales manager.  Davenport posted advertisements on the internet to attract

additional experienced salespeople for Homes, luring these salesmen with the opportunity to earn

significant, uncapped commissions by cold-calling prospective investors identified on lead lists

to solicit investments in a Homes-related offering.  After hiring a sales staff, Faulkner and

Rapoport trained the salesmen to disseminate untrue and misleading information about Homes

and Renaissance to deceive investors.  Prospective investors who received phone solicitations

were inundated with lies about Homes' track record, including representations that Homes has

consistently generated double-digit returns for its investors during the prior seven years.

5.     Since March 2017, Homes has raised at least $168,750 as part of its unregistered

Renaissance offering.  To date, *none* of the investor funds have been used for real estate

transactions or activity.  Rather, most of the funds have been used to pay the Homes salespeople

(including Davenport), while some investor funds have been diverted to Faulkner.

6.     Moreover, as detailed below, Faulkner remains undeterred by either (1) the recent

seizure of a Renaissance bank account by the United States Attorney's Office for the Northern

District of Texas; or (2) the August 14, 2017 Orders issued by this Court in the Breitling Scheme

litigation imposing a temporary restraining order and asset freeze, and appointing a temporary

receiver (collectively the "TRO"), based at least in part on evidence showing that after the SEC

filed suit in June 2016 Faulkner has been diverting oil-and-gas revenue checks due and owing to

investors and misappropriating those funds for other purposes.  Some of these funds were used to

fund Homes' initial operations and to pay Rapoport and Davenport.  In fact, less than ten days

after entry of the TRO, Faulkner requested 1,000 more copies of one of the misleading

Renaissance marketing materials from the Dallas-based printing company for distribution to

prospective investors.

7.      By engaging in this conduct, each of the Defendants has violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77a *et seq.*] and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78a *et seq.*].  Additionally, as set forth in more detail, Defendants Faulkner, Homes, and Davenport violated the securities registration provisions of the Securities Act.  In the interest of protecting the public from any further fraudulent activity and harm as part of this ongoing fraud, the Commission brings this case against the Defendants seeking: (i) temporary, preliminary, and permanent injunctive relief; (ii) disgorgement of ill-gotten gains; (iii) accrued prejudgment interest on those ill-gotten gains; (iv) civil monetary penalties; and (v) other emergency relief.

## JURISDICTION AND VENUE

8.      Defendants Faulkner, Homes, and Davenport offer and sell units in Renaissance for $50,000/unit and claim that investor funds are pooled together to fund the purchase, renovation, and resale of homes in Southern California.  After Homes purportedly flips the homes in connection with its Renaissance offering, Defendants claim that investors will share in the resulting profits.  Further, Defendants reiterate that investments in Renaissance are passive. As a result, the units in Renaissance are "investment contracts" and the interests being offered, purchased, and sold satisfy the definition of a "security" in Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].  Thus, the Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78(aa)].

9.      Venue is proper because the Defendants have offered this investment to a prospective investor residing in Mesquite, Texas, among other locations across the United States.

Further, Defendants tout as a successful "past project" of Homes Inc. a home located in Dallas, Texas. Faulkner and Homes also use a Dallas, Texas-based printing company to create the marketing materials that Homes ships to prospective investors across the country. Mesquite and Dallas are both located within Dallas County, Texas, which is within the Dallas Division of the Northern District of Texas.

10.     Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Certain of these transactions, acts, practices, and courses of business occurred in the Northern District of Texas.

## DEFENDANTS

11.     **Christopher A. Faulkner**, age 40, currently resides in Venice, California. Faulkner controls Homes and purports to act as its President and Secretary. Faulkner is also the organizer and manager of Renaissance. Faulkner is currently the lead defendant in an ongoing SEC enforcement action. *See SEC v. Faulkner, et al.*, No. 3:16-CV-01735-D (N.D. Tex.) (Fitzwater, J.).

12.     **Homes Inc.** is a Wyoming corporation that was incorporated in December 2010 as Acadian Capital Corp. In or around September 2013, Acadian Capital Corp. changed its name to Homes Inc. Homes currently maintains its principal place of business in Los Angeles, California, and routinely contacts prospective investors all across the United States. Rapoport is identified as Homes' President on the website and in its marketing materials, but Faulkner controls Homes and its operations. A July 3, 2017 amended annual report for Homes filed with the Wyoming Secretary State identifies "C.A. Faulkner" as the President, Vice President,

Secretary, Treasurer and Director of the company. Neither Homes nor its securities offering are registered with the Commission.

13.     **HOMESINC Renaissance, LLC ("Renaissance")** is a California limited liability company formed by Faulkner in or around February 2017. Renaissance maintains its principal place of business in Los Angeles, California. Renaissance purports to be owned by Homes and is managed by Rapoport and Faulkner. A July 5, 2017 amendment to Renaissance's articles of organization filed with the California Secretary of States identifies "Christopher Aundre Faulkner" as the sole manager. Neither Renaissance nor its securities offering are registered with the Commission.

14.     **Matthew G. Rapoport**, age 35, resides in Los Angeles, California. Rapoport is listed in marketing materials and on the Homes website as the President and a managing partner of Homes and a manager of Renaissance.   In the past, Rapoport has provided information technology services for companies owned or controlled by Faulkner, including but not limited to BOG and BECC.

15.     **Earl Nelson Davenport**, age 58, resides in Los Angeles, California. Davenport is the sales manager and director of investor relations for Homes. and solicits investments in Renaissance. In 2014, the California Department of Business Oversight issued a cease-and-refrain order against Davenport for failing to disclose material facts to investors in connection with sales of securities. In 2009, the Pennsylvania Securities Commission issued a cease-and-desist order against Davenport for selling unregistered securities.

## STATEMENT OF FACTS

16.     In or around September 2016, Faulkner used Homes, a previously inactive shell company he had owned or controlled for several years, to start a new venture. Faulkner enlisted the help of long-time associate Rapoport, the chief operating officer of a Los Angeles-based web hosting and internet services company owned, in part, by Faulkner and Rapoport.

17.     Faulkner and Rapoport sought to market Homes as a real estate investment firm that pooled investor funds to buy, renovate, and resell residential real estate in Southern California. To conceal his involvement, Faulkner installed Rapoport as the public face of Homes. Privately, Faulkner held himself out as Homes' "managing partner" and controlled its operations.

18.     Rapoport opened a bank account for Homes in September 2016, listing Faulkner's BECC email address as the contact email on the account opening documents. Faulkner signed the banking resolution on behalf of Homes as its President and Secretary.

### Faulkner creates Homes marketing materials and sets up Renaissance

19.     On or around November 11, 2016, Faulkner used his BECC email address to email the Dallas, Texas-based printer which printed the Breitling Scheme offering materials. Faulkner told the printer that he was "starting a new venture out in Los Angeles" and needed marketing materials for the "same scenario as what we used to do at Breitling." When Faulkner referred to "Breitling" he was referring to his prior venture, whereby BOG and other companies that Faulkner controlled offered and sold oil-and-gas interests to investors across the country using, among other things, materially misleading marketing materials and offering documents.[2]

---

[2] *See SEC v. Faulkner, et al.*, No. 3:16-CV-01735-D (N.D. Tex.) (Fitzwater, J.) for details on the Breitling Scheme.

20.     In January 2017, Faulkner started communicating with the printer from a Homes email address - "cfaulkner@homesinc.com" - and used a signature line that identified him as the "Managing Partner" of Homes in Los Angeles, CA.

21.     In or around February 2017, Faulkner formally organized Renaissance. Faulkner handpicked his mother – Texas attorney Carole A. Faulkner – and Rapoport to be identified in the Renaissance operating agreement as Renaissance's "managers." However, Faulkner and Rapoport served as Renaissance's actual managers, and a July 5, 2017 amendment to Renaissance's articles of organization filed with the California Secretary of State identifies Faulkner as the sole manager. Homes is identified in the Renaissance operating agreement as purportedly owning 100 percent of Renaissance.

22.     Around the same time, Faulkner drafted, edited, and/or approved the use of several documents for Homes and Renaissance, including (a) a 12-page marketing brochure ("Renaissance Brochure"); (b) a double-sided flyer purporting to highlight two homes Homes had purportedly flipped successfully and profitably; (c) a 26-page operating agreement for Renaissance; and (d) a 5-page unit issuance agreement for Renaissance (collectively, the "Investor Packet"). None of these documents mentioned or identified Faulkner's role in or control over Homes or Renaissance.

23.     Throughout the Renaissance Brochure, Homes repeatedly emphasizes the passive nature of the Renaissance investment. For example, Homes touts that: (i) it "removes all the guesswork and hassle of passive real-estate investing and put[s] your money to work without you lifting a finger;" (ii) "[r]ather than working hard for your money, now is the time to let your money work for you;" and (iii) ". . . now is the time to jump in and become a passive real-estate

owner . . . [p]artner with Homes, Inc. today, and let us take your passive real estate strategies to the next level."

24.    Between February 2017 and April 2017, Faulkner requested the Dallas, Texas-based printer to print at least 1,000 copies of the Investor Packet.  The printer shipped those materials to Faulkner's attention at Homes' Los Angeles, California office.

25.    Around the same time, Faulkner used bank accounts he controls to deposit revenue checks from oil-and-gas operators.  At least some of these funds are due and owing to investors in the Breitling Scheme; Faulkner, however, used these funds for his own personal use, including sending money to Homes.  Specifically, between February 23, 2017 and March 31, 2017, Faulkner drafted at least six checks payable to Homes from an account he controlled in the name of "Breitling Ventures Corporation," totaling at least $22,500.  Faulkner signed these checks and they were deposited into Homes' bank accounts to help fund the Homes' initial operations.

**False and misleading Investor Packet and website**

26.    The 12-page Renaissance Brochure contains materially false and misleading representations, including among other things: (a) a claim that Homes assumes its use of "auction, off-market and probate buying methods" and its purported "below market cost of renovations" will result in homes being worth 23.0% more than the costs to acquire and renovate them; (b) that Homes "has access to databases of foreclosure and pre-foreclosure homes before the general public does"; (c) that Homes has invested in "older homes in need of improvement" and "manage[d] the necessary updates to warrant high prices at resale"; and (d) that by "partnering with [Homes] you gain access to years of expertise in managing extensive remodeling as well as our track record of producing profitable projects time and again."

27.     None of these representations are true.  Homes has not utilized any "auction, off-market and probate buying methods" because it has never purchased a home.  Similarly, it cannot reasonably claim that it can perform "below market cost of renovations" because it has never renovated a project.  It does not have any experience – much less "years of expertise" – "managing extensive remodeling," nor does it have a proven "track record of producing profitable projects time and again."

28.     Faulkner and Rapoport also established an internet presence for Homes by creating a publicly-available website.  Similar to the Investor Packet, the Homes website does not mention or identify Faulkner – or his management and control over Homes and its Renaissance offering – anywhere.

29.     The Investor Packet and Homes website also falsely identify residential properties as "past projects" of Homes.  For example, the Homes website lists three properties (by street name and number only) in its "Past Projects" section: (a) 6233 Marquita, (b) 2431 Meadow Valley, and (c) 6127 Yarmouth.

30.     None of these properties, however, was purchased, renovated, or sold by Homes, nor were they part of any Homes-sponsored offering sold to investors.  In fact, despite marketing itself as a company that buys and flips homes in the "booming Southern California real estate market" by "using data sets that focus on hyperlocal features" and "research[ing] neighborhoods throughout SoCal . . . ," one of the three homes (6233 Marquita) is actually located in Dallas, Texas.  Two of the homes (6233 Marquita and 2431 Meadow Valley) were purchased and sold by Tamra Freedman (Faulkner's ex-wife) in her own name.  Meanwhile, the third house (6127 Yarmouth Ave.) has been owned by Rapoport or his wife since at least 2009.  In sum, none of

these three homes were "past projects" of Homes nor were they part of any investments offered or sold to investors by Homes.

31.     Likewise, the Investor Packet includes similar false and misleading representations.   Faulkner created, and Homes disseminated to investors, a double-sided marketing flyer on Homes letterhead that highlights the Marquita home on one side and the Meadow Valley home on the other side.   Faulkner created this flyer, and then directed Homes to send it to prospective investors to mislead them into believing that these two homes were properties that Homes successfully flipped as part of its prior business operations.

**Faulkner and Rapoport hired call center sales staff to sell Renaissance offering**

32.     Homes seeks to raise $5 million in its Renaissance offering through the sale of one-percent units for $50,000/unit.   By investing in Renaissance, investors purportedly acquire the right to share in the ownership, profits, and losses of Renaissance when homes were flipped.

33.     As Faulkner and Rapoport created marketing materials and a website to help attract investors, they also set up a call center and hired a sales staff to offer and sell the Renaissance offering.   To oversee the call center and manage the sales staff, Faulkner and Rapoport hired Davenport.   Unbeknownst to investors, Davenport has experience violating state securities laws.   For example, in 2014, the State of California's Department of Business Oversight issued a Desist and Refrain Order against Davenport for failing to disclose material facts to investors in connection with the offer and sale of securities.   In particular, that agency found that Davenport failed to disclose to investors that he: (a) received a Cease-and-Desist Order from the Pennsylvania Securities Commission in September 2009 for violating the Pennsylvania securities laws in connection with the offer and sale of securities; (b) was convicted in Tennessee of a felony offense of theft over $10,000 in 2001; and (c) was found

guilty of one felony count of conspiracy to possess a controlled substance in the State of Washington in 2000. These prior orders and findings were not disclosed to investors. In fact, to conceal his true identity and background from prospective investors, Davenport used his middle name (Nelson), instead of his first name (Earl). As a result, prospective investors who might attempt to search for "Nelson Davenport" on the internet likely would not locate him or any actions taken against "Earl N. Davenport" by securities regulators.

34.     After hiring Davenport, Homes ramped up solicitation efforts by courting aggressive salesmen. In or around April 2017, Davenport posted an ad on Craigslist.com that:

a.     included a photo of a shark;

b.     solicited "openers/fronters" with "[e]xperience fronting LLC, LP/GP, PPM, OIL AND GAS, IPO, or METALS or any other large ticket experience" and stated that "IF YOU HAVE EXPERIENCE FRONTING IN PRECIOUS METALS, OIL AND GAS, MOVIES OR ANY HIGH $$ TELESALES EXPERIENCE WE WANT TO TALK TO YOU – YOUR DESK IS WAITING;"

c.     represented that the company would provide "UNLIMITED LEADS DAILY . . . EXPENSIVE LEADS WE PAY FOR;"

d.     touted that they had "spent millions of dollars on advertising to create this brand, drive traffic to our website and generate tons of web leads;"

e.     claimed "[t]his is a REAL deal – you will not be selling BS;"

f.     highlighted a "[p]henomenal opportunity to make $150,000+ a year," to "MAKE REAL MONEY," and "$$$$$$$$$$$UNCAPPED COMMISSIONS PAID WEEKLY$$$$$$$$$$$$$$$,"

g.     indicated that interested individuals "must call 150+ calls a day minimum;"

h.     represented that the "business in operation since 2010 with proven track record in real estate with happy clients" with an "office in the heart of the Sawtelle area [1663 Sawtelle] of Los Angeles;" and

i.     encouraged individuals to "Call Nelson" and included a personal cell phone number for interested candidates to contact.

35.    Faulkner and Rapoport interviewed and hired Homes' sales staff.  During training sessions with the sales staff, they touted that Homes had been in the real estate investment business since 2010 and had been paying investors attractive returns during that time.  These representations were false, and Faulkner and Rapoport knew it.  In fact, Faulkner and Rapoport armed the Homes salesforce with false and misleading information to intentionally deceive investors across the country into believing that Homes had been in the business of profitably flipping homes in Southern California for seven years.  As a result, Davenport and the sales staff repeated these misrepresentations to scores of investors during cold-calls.

36.    In connection with aggressive over-the-phone sales pitches, the Homes salespeople sent the misleading Investor Packets via FedEx to investors across the country, including to at least one prospective investor in Mesquite, Texas.

### Homes' salespeople further misrepresent the company's track record and the Renaissance investment

37.    Davenport has personally pitched Homes and its Renaissance investment opportunity to prospective investors.  In so doing, Davenport claimed that: (a) investor funds are pooled together in a Renaissance bank account and then used to purchase and renovate undervalued residential real estate in Southern California, (b) investors do not need to do any work because the investment is passive, and (c) investors receive income every 60-90 days when the properties are sold for a profit.

38.    Davenport has also made numerous material misrepresentations about Homes' track record and the purported past successes of Homes and Renaissance.  Among other things, Davenport misrepresented that Homes:

     a.  has a seven-year track record of selling investments in as many as 12 prior offerings, including at least one involving commercial properties;

13

    b.  yielded an average return of 13-14 percent in its prior offerings;

    c.  completed a $10 million offering four years ago, which returned 11 percent to investors; and

    d.  had raised approximately half of the $5 million Renaissance offering from 20 investors.

39.    Another Homes salesman made similar misrepresentations, including that:

    a.  Homes sells it properties 12-24 days after it pounds the sign in the ground, usually asking price or better.

    b.  Over the last eight years, Homes rendered a 22-38 percent profit on sales of properties.

    c.  Most of the salesman's clients are buying five unit blocks of the Renaissance investment for $250,000.

    d.  The Homes model is "a smooth operation. We've been doing it for years."

    e.  The Homes website includes a listing of the latest properties that Homes has flipped.

    f.  Homes' Renaissance investment provides "a good return, and what could be more secure than paid for real estate in, you know, southern California?"

40.    Actually, Homes: (a) was inactive until September 2016; (b) had no history or track record of offering or selling investments; (c) had not previously raised funds in *any* offerings and, therefore, could not have returned an average of 13-14 percent to investors; and (d) had raised less than $170,000 from fewer than 10 investors in connection with the Renaissance offering.

**Renaissance investor funds have not been used for real-estate related activity**

41.    As of the end of July 2017, Homes had raised at least $168,750 from eight investors. These investor funds were initially deposited into a Renaissance bank account. However, neither Homes nor Renaissance has engaged in any transactions or activity related to

real estate development.  Excluding fees and one debit card purchase, Renaissance bank records

through the end of July 2017 reveal only: (a) $8,500 in cash withdrawals; (b) nearly $50,000 in

transfers to the Homes bank account; and (c) a $5,000 check payable to Faulkner.

42.    Instead, Faulkner and Rapoport have used the $50,000 transferred to the Homes

bank account to: (a) make thousands of dollars of additional cash withdrawals; (b) issue checks

to salespeople totaling thousands of dollars (including at least $5,000 to Davenport); and (c)

make debit card purchases from vendors such as jet.com, investorleads.com, craigslist.org and

Google ad words.

43.    In August 2017, the United States Attorney's Office for the Northern District of

Texas executed a seizure warrant on a bank account in the name of Renaissance.  On August 14,

2017, the Honorable Sidney A. Fitzwater issued a TRO, asset freeze, and appointment of a

temporary receiver over Faulkner, BOG, and BECC in the Faulkner Breitling Scheme litigation

related, at least in part, to Faulkner's misappropriation of funds due and owing to investors in the

Breitling Scheme through bank accounts he controlled.  As detailed above, Faulkner transferred

some of these funds directly to Homes ($22,500) and also drafted checks from these accounts

payable to Davenport and Rapoport totaling nearly $50,000.

44.    Undeterred by the regulatory activities identified in the preceding paragraph, nine

days later, Faulkner requested 1,000 more copies of the misleading Renaissance Brochures from

the Dallas-based printing company to continue soliciting investors for the Renaissance offering.

## FIRST CLAIM FOR RELIEF

### Violations of Antifraud Provisions of the Exchange Act:
### Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

### [against Defendants Christopher A. Faulkner, Homes Inc.,
### HOMESINC Renaissance, LLC, Matthew Rapoport and Earl Nelson Davenport]

45.    The Commission repeats and re-alleges Paragraphs 1 through 44 of this Complaint, as if fully set forth herein.

46.    By engaging in the conduct described above, Faulkner, Homes, Renaissance, and Rapoport, in connection with the purchase or sale of securities, by the use of a means or instrumentality of interstate commerce, or of the mails or of a facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operate as a fraud or deceit upon persons, including purchasers or sellers of securities.

47.    By engaging in the conduct described above, Davenport, in connection with the purchase or sale of securities, by the use of a means or instrumentality of interstate commerce, or of the mails or of a facility of any national securities exchange, directly or indirectly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.    Faulkner, Homes, Renaissance, Rapoport, and Davenport engaged in the above-referenced conduct knowingly or with severe recklessness.

49.    By engaging in the conduct described above, Faulkner, Homes, Renaissance, and Rapoport violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

50.     By engaging in the conduct described above, Davenport violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Violations of Antifraud Provisions of the Securities Act: Section 17(a) [15 U.S.C. § 77q(a)]

### [against Defendants Christopher A. Faulkner, Homes Inc., HOMESINC Renaissance, LLC, Matthew Rapoport, and Earl Nelson Davenport]

51.     The Commission repeats and re-alleges Paragraphs 1 through 44 of this Complaint, as if fully set forth herein.

52.     By engaging in the conduct described above , Faulkner, Homes, Renaissance, and Rapoport, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or with severe recklessness, employed a device, scheme, or an artifice to defraud.

53.     By engaging in the conduct described above, Faulkner, Homes, Renaissance, Rapoport, and Davenport, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, and at least negligently, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     By engaging in the conduct described above, Faulkner, Homes, Renaissance, and Rapoport, directly or indirectly, in the offer or sale of securities, by the use of means or

17

instruments of transportation or communication in interstate commerce or by use of the mails, and at least negligently, engaged in transactions, practices, and/or courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

55.     By engaging in the conduct described above, Faulkner, Homes, Renaissance, and Rapoport violated, and unless enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

56.     By engaging in the conduct described above, Davenport violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### THIRD CLAIM FOR RELIEF

**Violations of the Securities Registration Provisions of the Securities Act:
Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e]**

**[against Defendants Christopher A. Faulkner, Homes Inc., and Earl Nelson Davenport]**

57.     The Commission repeats and re-alleges Paragraphs 1 through 44 of this Complaint, as if fully set forth herein.

58.     By engaging in the conduct described above, Faulkner, Homes, and Davenport, directly or indirectly, singly or in concert with others, (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium

of written contracts, offering documents, prospectus, oral and written statements, or otherwise,

securities as to which no registration statement had been filed.

59.     By engaging in the conduct described above, Faulkner, Homes, and Davenport

have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the

Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

For these reasons, the Commission respectfully asks the Court to enter a final judgment:

1.     permanently enjoining Christopher A. Faulkner from:

    a.     violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

    b.     directly or indirectly, including, but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

2.     permanently enjoining Homes Inc. from:

    a.     violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

    b.     directly or indirectly, including, but not limited to, through any entity owned or controlled by it, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent it from purchasing or selling securities for its own personal account.

3.     permanently enjoining HOMESINC Renaissance from:

    a.     violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

    b.     directly or indirectly, including, but not limited to, through any entity owned or controlled by it, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent it from purchasing or selling securities for its own personal account.

4.      permanently enjoining Matthew G. Rapoport from:

   a.      violating Section 17(a) of the Securities Act and Section 10(b) of the
           Exchange Act and Rule 10b-5 thereunder; and

   b.      directly or indirectly, including, but not limited to, through any entity
           owned or controlled by him, from participating in the issuance, purchase,
           offer, or sale of any security; provided, however, that such injunction shall
           not prevent him from purchasing or selling securities for his own personal
           account.

5.      permanently enjoining Earl Nelson Davenport from:

   a.      violating Section 17(a)(2) of the Securities Act and Section 10(b) of the
           Exchange Act and Rule 10b-5(b) thereunder; and

   b.      directly or indirectly, including, but not limited to, through any entity
           owned or controlled by him, from participating in the issuance, purchase,
           offer, or sale of any security; provided, however, that such injunction shall
           not prevent him from purchasing or selling securities for his own personal
           account.

6.      ordering all the Defendants to disgorge ill-gotten gains and benefits obtained or to
        which they were not otherwise entitled, as a result of the violations alleged herein,
        plus prejudgment interest on those amounts;

7.      ordering all the Defendants to pay civil penalties under Section 20(d) of the
        Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15
        U.S.C. § 78u(d)(3)]; and

8.      granting such additional relief as the Court deems just, appropriate, and equitable.

Respectfully submitted,

DATED:  September 11, 2017

B. DAVID FRASER
Lead Attorney
Texas Bar No. 24012654
TIMOTHY S. McCOLE
Mississippi Bar No. 10628
JAMES E. ETRI
Texas Bar No. 24002061
SCOTT F. MASCIANICA
Texas Bar No. 24072222
SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry St., Unit #18
Fort Worth, TX 76102-6882
(817) 978-1409
(817) 978-4927 (fax)
FraserB@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

JS 44 (Rev. 08/16) - TXND (Rev. 12/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

RECEIVED
SEP 11 2017
2017
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## I. (a) PLAINTIFFS

U.S. SECURITIES AND EXCHANGE COMMISSION

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
B. David Fraser, U.S. Securities & Exchange Commission
801 Cherry St., Suite 1900, Fort Worth, TX 76102
(817) 978-1409

## DEFENDANTS

Christopher A. Faulkner, Homes Inc., HOMESINC Renaissance, LLC, Matthew Rapoport, and Earl Nelson Davenport

County of Residence of First Listed Defendant   Los Angeles County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**317 - CV 2405 - G**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|    & Enforcement of Judgment |    Slander      Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | | | ☐ 470 Racketeer Influenced and |
|    Student Loans | ☐ 340 Marine      Injury Product | **LABOR** | **SOCIAL SECURITY** |    Corrupt Organizations |
|    (Excludes Veterans) | ☐ 345 Marine Product      Liability | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** |    Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☒ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |    Relations | ☐ 864 SSID Title XVI |    Exchange |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage |    Leave Act | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury -      Product Liability | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| | Medical Malpractice | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** |    Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** |    Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | |    26 USC 7609 |    Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | | | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | |    State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | | **IMMIGRATION** | |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other   ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sec 5(a), 5(c) and 17(a) Securities Act [15 U.S.C. §§77e(a), 77e(c), and 77q(a)] Sec 10(b)

Brief description of cause:
Exchange Act [15 U.S.C.§78j(b)] Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Hon. Sidney A. Fitzwater

DOCKET NUMBER   3:16-cv-01735-D

DATE
9/11/2017

SIGNATURE OF ATTORNEY OF RECORD
*B. David Fraser*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____